In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1159

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

OSCAR GUTIERREZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cr-00209-TWP-TAB-2 — **Tanya Walton Pratt**, *Judge.*

ARGUED JUNE 2, 2014 — DECIDED JULY 29, 2014

Before FLAUM and WILLIAMS, *Circuit Judges*, and DOW, *District Judge.**

FLAUM, *Circuit Judge*. Based on a tip that Oscar Gutierrez was involved in drug trafficking, law enforcement went to his home with a certified narcotics canine and knocked at the front door. Officers saw movement inside, but no one an-

---

* Of the Northern District of Illinois, sitting by designation.

swered the door. The officers had the dog examine the front door for the scent of narcotics, and he alerted. After knocking for fifteen minutes, the officers forcibly entered and secured the home, but they did not conduct a search until an officer swore out an affidavit and returned with a search warrant. That warrant relied on the dog's positive alert. The ensuing search revealed eleven pounds of methamphetamine in Gutierrez's home.

All of this occurred in November 2012. In 2013, however, the Supreme Court held that the use of a drug-sniffing dog on an individual's porch is a Fourth Amendment search. *Florida v. Jardines*, 133 S. Ct. 1409, 1414–16 (2013). There is thus no question that the sniff in Gutierrez's case is no longer permissible, for the officers lacked a warrant (at the time of the sniff) and no exception to the warrant requirement applied; moreover, a warrant based primarily on an impermissible sniff would be invalid. However, under *Davis v. United States*, 131 S. Ct. 2419 (2011), the evidence in this case should not be suppressed if "binding appellate precedent specifically authorize[d]" the officers' conduct at the time they acted. *Id.* at 2429 (emphasis omitted). The district court found that our precedent did authorize the officers' conduct. We agree, and therefore affirm.

## I. Background

In November 2012, officers received a tip from a confidential informant that Gutierrez was involved in drug trafficking and resided at a particular address in Indianapolis. A few days later, numerous law enforcement officers—including an agent with the Drug Enforcement Agency ("DEA") and detectives with the Indianapolis Metro Drug Task Force ("Task Force")—converged on the home where

Gutierrez lived. They brought a certified drug dog named Fletch with them. When officers knocked on the front door, they saw movement within the house but nobody answered. Detective Sergeant Cline, a Task Force member, had Fletch examine the front door for the scent of narcotics. Fletch gave a positive indication when he smelled the door. The officers continued to knock, and after about fifteen minutes of receiving no response, they were instructed by the Marion County Prosecutor to enter and secure the home. They then forcibly entered and conducted a sweep for occupants. Sometime after the officers entered the home, Detective Sergeant Cline left to obtain a search warrant. In his search warrant affidavit, Cline identified the informant's tip, the knock-and-talk attempt, and Fletch's positive indication at the door as bases for the warrant. A state court magistrate found probable cause and issued the search warrant.

After entering the home, officers found Gutierrez and Cota, both of whom were tenants, in bed in separate rooms. Gutierrez and Cota were immediately handcuffed and brought to the kitchen. However, the actual search did not begin until the warrant arrived at the residence. During the search, DEA Agent Schmidt found a black duffel bag containing 11.3 pounds of methamphetamine in the attic. Both defendants were charged in December 2012 with a single count of possession with intent to distribute over 50 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

In March 2013, the Supreme Court decided *Florida v. Jardines*, 133 S. Ct. 1409 (2013), which held that a drug-dog's sniff on the curtilage of a home is a Fourth Amendment "search." *Id.* at 1414. Two months later, Gutierrez filed a motion to suppress, arguing that law enforcement's investiga-

tion and conduct outside his home constituted a search for which a warrant was required, and that any evidence recovered during the subsequent search should be suppressed. The district court denied the motion. Citing *Jardines*, the court agreed that the dog sniff was a search that violated the Fourth Amendment. However, the court determined that the "good-faith" exception to the exclusionary rule applied.

The good-faith exception provides that the exclusionary rule does not apply where police officers reasonably and in good faith believe that their conduct is lawful, such as reliance on a warrant later found to be invalid. *United States v. Leon*, 468 U.S. 897, 922 (1984). This exception applies, among other circumstances, when an officer conducts a search in reliance on then-binding appellate precedent. *See Davis*, 131 S. Ct. at 2429. The district court determined that, under appellate precedent that was binding at the time of the dog sniff, "officers were not only lawfully at the front door of Defendants' home but at that time the dog sniff did not constitute a search under the Fourth Amendment. The officers, and the magistrate that issued the warrant, relied upon this precedent in good faith, and the purpose of the exclusionary rule would not be effectively advanced in this particular case." Therefore, the district court declined to suppress the evidence seized in the search. The court separately found that the officers' entry prior to obtaining the search warrant was not a Fourth Amendment violation, because under Seventh Circuit precedent, "officers who enter and seize a home to preserve the status quo while waiting for a search warrant do not commit an independently sanctionable violation of the Fourth Amendment so long as they had probable cause at the moment of entry and the seizure is not unreasonably long." *United States v. Etchin*, 614 F.3d 726, 734 (7th Cir. 2010)

(citing *Segura v. United States*, 468 U.S. 796, 798 (1984)).

Gutierrez then pleaded guilty, but his plea agreement permits him to appeal the district court's denial of his suppression motion. The court sentenced him to the mandatory minimum, 120 months' imprisonment. After Gutierrez pleaded, the district court dismissed the indictment against Gutierrez's co-defendant, Jose Cota, on the government's motion.

## II. Discussion

In reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Bernitt*, 392 F.3d 873, 876 (7th Cir. 2004).

### A. Fourth Amendment principles

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and subject to "few exceptions," it requires officers to obtain a warrant before searching a home. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). This protection extends to the home's curtilage—the area immediately surrounding and associated with the home. *California v. Ciraolo*, 476 U.S. 207, 212–13 (1986). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed," *United States v. Jacobsen*, 466 U.S. 109, 113 (1984), or when the government engages in an unlicensed physical intrusion of a constitutionally protected area in order to obtain information, *Jardines*, 133 S. Ct. at 1414–15.

The next relevant principle is the exclusionary rule, which forbids the use of unlawfully obtained evidence at tri-

al. As late as 1971, the Supreme Court concluded that a
Fourth Amendment violation automatically led to exclusion
of the improperly obtained evidence. *See Whiteley v. Warden,
Wyo. State Penitentiary*, 401 U.S. 560, 568–69 (1971). However,
the Court shifted its approach thereafter, explaining that the
exclusionary rule is a "judicially created remedy," not a per-
sonal constitutional right. *United States v. Calandra*, 414 U.S.
338, 348 (1974). Application of the exclusionary rule depends
on weighing the costs and benefits in each case. Its benefit is
deterring police misconduct, *Leon*, 468 U.S. at 916; but on the
cost side of the ledger, "[e]xclusion exacts a heavy toll on
both the judicial system and society at large," as it often
"suppress[es] the truth" and risks "set[ting] the criminal
loose in the community without punishment," *Davis*, 131
S. Ct. at 2427. Thus, exclusion is the option of "last resort,"
but it tends to be merited when police exhibit "deliberate,
reckless, or grossly negligent disregard for Fourth Amend-
ment rights." *Id.* (citations omitted). Exclusion does not ap-
ply in several circumstances, including when police conduct
a search in objectively reasonable, good-faith reliance
on "binding appellate precedent." *Id.* at 2429.

In *Davis*, the officers did just that. They conducted a rou-
tine traffic stop, lawfully arrested the driver and passenger,
and then searched the car, where they found evidence of an
additional, unrelated crime. *Id.* at 2425. Governing Eleventh
Circuit precedent permitted this car search at the time, but
while Davis's case was on direct appeal, the Supreme Court
found this sort of car search unconstitutional. *See Arizona v.
Gant*, 556 U.S. 332, 335 (2009). Nonetheless, when Davis's
appeal reached the Court, it held that exclusion was inap-
propriate: "when binding appellate precedent specifically
*authorizes* a particular police practice, well-trained officers

will and should use that tool to fulfill their crime-detection and public-safety responsibilities. An officer who conducts a search in reliance on binding appellate precedent does no more than act as a reasonable officer would and should act under the circumstances." *Davis*, 131 S. Ct. at 2429 (citations, brackets, and internal quotation marks omitted).

In light of *Davis*, the evidence in Gutierrez's case should not be suppressed if binding appellate precedent authorized the officers' conduct. We therefore proceed to consider our relevant precedent, *United States v. Brock*, 417 F.3d 692 (7th Cir. 2005).

## B. Seventh Circuit precedent

In *Brock*, law enforcement executed a search warrant at David Brock's home at 3375 Payton Avenue in Indianapolis, where they found drugs. Brock was not home, but three other individuals were. When the police questioned them, one of them said that he lived next door at 3381 Payton Avenue, and that he watched over both houses. This man said that Brock rented a room at the 3381 residence, which Brock used as his "stash house." He also told the police that Brock transported methamphetamine between the two residences, and was storing 16 to 17 pounds of methamphetamine in his room at 3381. Finally, this man gave the police a key to 3381, and consented to a search of the common areas of that residence. The 3381 residence consisted of a kitchen, a living room, and three locked bedrooms. One bedroom was locked and had a sign on the door that read, "Stay Out. David." An officer with a drug-sniffing dog, Yoba, was called to 3381 to corroborate the presence of narcotics. Yoba alerted while sniffing just outside Brock's bedroom. Based on all of these facts (including Yoba's alert), an officer sought a warrant,

which a magistrate issued. Officers then forcibly entered Brock's room, where they found 17 pounds of methamphetamine and one pound of cocaine. Brock moved to suppress the evidence, arguing that the dog sniff outside his locked bedroom door constituted an unlawful warrantless search, and that the warrant that was issued in reliance on the sniff violated his Fourth Amendment rights. *Id.* at 693–95. We affirmed the denial of his motion to suppress.

*Brock* relied on the numerous Supreme Court decisions holding that a drug-dog sniff does not constitute a search for Fourth Amendment purposes because it reveals only the presence or absence of narcotics and therefore implicates no legitimate privacy interest. *Id.* at 695 (citing *Illinois v. Caballes*, 543 U.S. 405, 408–09 (2005) (dog sniff of a car during a traffic stop); *Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (dog sniff at drug interdiction checkpoint); *United States v. Jacobsen*, 466 U.S. 109, 123 (1984) (chemical field test of a substance found inside a package); *United States v. Place*, 462 U.S. 696, 707 (1983) (dog sniff of a traveler's luggage in the airport)). We acknowledged that, unlike those cases, the dog sniff in Brock's case occurred in his *home*. But we rejected Brock's reliance on *Kyllo v. United States*, 533 U.S. 27 (2001), which involved a thermal imaging search of the defendant's home. The *Kyllo* Court had emphasized that the use of a thermal imaging device revealed both lawful and unlawful conduct, so we reasoned that a dog sniff was different because the Court had repeatedly explained that a dog sniff detected only contraband and was not even a Fourth Amendment "search." *See, e.g., Place*, 462 U.S. at 707 ("[T]he canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information re-

vealed by the procedure. Therefore, we conclude that … exposure of respondent's luggage … to a trained canine … did not constitute a 'search' within the meaning of the Fourth Amendment.").

*Brock* therefore held that "the dog sniff inside Brock's residence was not a Fourth Amendment search because it detected only the presence of contraband and did not provide any information about lawful activity over which Brock had a legitimate expectation of privacy." 417 F.3d at 696.[1] We further explained: "Critical to our holding that the dog sniff in this case was not a Fourth Amendment search is the fact that police were lawfully present inside the common areas of the residence with the consent of Brock's roommate." *Id.* at 697.

### C. *Brock* **remained good law at the time of the search in this case**

*Brock* is no longer good law; *Jardines* expressly held that a drug-dog's sniff on the curtilage is a Fourth Amendment search for which a warrant is typically required. 133 S. Ct. at 1414. But that does not necessarily help Gutierrez, for the question here is whether *Brock* was good law at the time of the search in *this* case. Gutierrez contends that it was not. He argues that *Jardines* itself did not change the law, but merely acknowledged a change that had already occurred in *United States v. Jones*, 132 S. Ct. 945 (2012), which was decided ten months before the search of Gutierrez's home. However, we

---

[1] We noted that our holding was consistent with the majority of our sister circuits' opinions in dog-sniff cases. *See Brock*, 417 F.3d at 696 (collecting cases).

conclude that *Brock* remained good law after *Jones* and was not effectively overruled until *Jardines*.

In *Jones*, the Court held that the government violated the Fourth Amendment by attaching a GPS tracker onto a suspect's car without a valid warrant and without the suspect's consent. *See* 132 S. Ct. at 949. Four concurring justices would have examined the case solely under the reasonable expectation of privacy rubric from *Katz v. United States*, 389 U.S. 347 (1967), and they criticized the majority's approach as "unwise" and as having "little if any support in Fourth Amendment case law." 132 S. Ct. at 958 (Alito, J., concurring in the judgment). But the majority concluded that, in addition to the *Katz* test, the Fourth Amendment incorporated a common-law trespass test, so that a common-law trespass into a constitutionally protected area could itself violate the Fourth Amendment. *Id.* at 949–51.

Nothing in *Jones* called into question the underlying premise of *Caballes* and *Place*—and thus of *Brock*—that an individual has no legitimate expectation of privacy in contraband, and therefore that a drug-dog's sniff is not a Fourth Amendment search. Moreover, the Court had previously emphasized that dog sniffs were "*sui generis*," *Place*, 462 U.S. at 707, suggesting that doctrinal changes to other Fourth Amendment principles might have no effect on this unique area.

Furthermore, less than a year before *Jones*, the Court noted that it is unproblematic for "law enforcement officers who are not armed with a warrant [to] knock on a door" of a home, including for investigatory purposes; in doing so, they "do no more than any private citizen might do." *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011); *see also* 1 WAYNE R.

LaFave, Search & Seizure: A Treatise on The Fourth Amendment § 2.3(e), at 592–93 (4th ed. 2004) ("The route which any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open ...."). *Jones* did not call into question any statements in *King*.

Thus, before *Jardines*, the Court had explicitly allowed police officers both to use dog sniffs and to enter the curtilage to seek information—both without a warrant. (Indeed, both actions remain permissible even after *Jardines*, so long as they are done separately.) The Court had never suggested that, when combined, these individually lawful actions might become unlawful.

The foregoing analysis is sufficient to determine that *Brock* remained good law at the time of the search of Gutierrez's home, but we find that *Jardines* itself further reinforces our conclusion. *Jardines*'s holding—that the use of a drug dog on the defendant's porch was a Fourth Amendment search—was based on an implied license theory. The Court reasoned that there is an implied license to approach the door, knock, and wait briefly to be received—but this license has a limited scope, which is based on custom. 133 S. Ct. at 1415–16. Specifically, this license is limited in space, time, and purpose. *Id.* And the key in *Jardines* was purpose: there was no "customary invitation" to use "a trained police dog to explore the area around the home in hopes of discovering incriminating evidence." *Id.* at 1416. The *Jardines* Court therefore rejected the state's argument—which echoed *Brock*—that cases like *Caballes*, *Jacobsen*, and *Place* permitted

the police to use warrantless dog sniffs, even on the curtilage, because the technique did not infringe any legitimate expectation of privacy.

The *Jardines* Court noted that "[j]ust last Term," in *Jones*, "we considered an argument much like" Florida's reasonable-expectations argument. *Id.* at 1417. Thus, Gutierrez contends, *Jardines* itself recognized that *Jones* abrogated *Brock*'s rationale. We disagree. Significantly, there was no reliable way to predict, after *Jones*, that the dispositive question would be the scope of the implied license—or that the implied license would exclude dog sniffs. *See* Orin S. Kerr, *The Curious History of Fourth Amendment Searches*, 2012 Sup. Ct. Rev. 67, 69 (2012) (observing—after *Jones* but before *Jardines*—that "implementing the *Jones* trespass test will require courts to resolve its scope. … Courts called on to interpret the trespass test must do so with little in the way of history or precedent to guide them."). As the four dissenting justices in *Jardines* pointed out, "in the entire body of common-law decisions, the Court has not found a single case holding that a visitor to the front door of a home commits a trespass if the visitor is accompanied by a dog on a leash. On the contrary, the common law allowed even unleashed dogs to wander on private property without committing a trespass." 133 S. Ct. at 1424 (Alito, J., dissenting); *see also id.* at 1420 (arguing that the Court's decision "is based on a putative rule of trespass law that is nowhere to be found in the annals of Anglo-American jurisprudence"). For all of these reasons, we find that *Brock* remained good law after *Jones*.

### D. The officers satisfied the good-faith exception here

In light of the foregoing, this case qualifies for the "binding appellate precedent" exception, because this case is ex-

actly like *Brock* in all important respects. First, as in *Brock*, police had a trained drug dog conduct a brief sniff at the door to a living space. *See Brock*, 417 F.3d at 693. The fact that one dog sniff occurred outside the front door to Gutierrez's home, and the other occurred outside the door to Brock's room, is immaterial. In both cases, police were lawfully present at the time of the search: in *Brock*, a cohabitant gave consent to a search of the common areas of the residence, *see United States v. Matlock*, 415 U.S. 164, 171 (1974); and in Gutierrez's case, the police walked up to the front door and knocked, which is lawful, *see Jardines*, 133 S. Ct. at 1416; *King*, 131 S. Ct. at 1862. In both cases, the officers then brought out their drug dog—now a constitutional violation under *Jardines*, but lawful at the time given *Caballes* and *Place*. In other words, at the time of both sniffs, there was no legal distinction between a "knock-and-talk" and a "knock-and-sniff." Furthermore, in both Brock and Gutierrez's cases, the police sought and obtained a warrant based in part on the positive dog alert. *See Brock*, 417 F.3d at 694. And in neither case did the police conduct a search until they were armed with a warrant. *See id.* This case and *Brock* are on all fours.

It is true, of course, that unlike in *Brock*, the police in Gutierrez's case entered the home and conducted a brief sweep before they had a warrant. Yet our precedent permits as much to preserve the status quo while officers obtain a warrant, *see Etchin*, 614 F.3d at 734, and the district court found it "undisputed that the actual search did not begin until the warrant arrived back at the residence." Thus, this minor factual distinction does not make a legal difference.

Another unimportant factual distinction is the fact that the officers in Gutierrez's case knocked at the front door for

about fifteen minutes. While it may rise to a constitutional violation if officers linger at the door too long, *see, e.g.*, *Jardines*, 133 S. Ct. at 1415, it is undisputed that (1) the officers were allowed to do a "knock-and-talk," where they attempt to get information voluntarily from a suspect, *see id.* at 1416; and (2) the officers here used Fletch shortly after the knock-and-talk attempt, and he quickly alerted. Only then did the officers allegedly "linger." The crucial moment was the dog sniff, because the positive alert formed the primary basis of the search warrant; and under *Brock*, the officers (and Fletch) were lawfully where they were at the time of the sniff. Thus, even if there were a "lingering" violation in this case, it would be harmless.

In sum, because binding appellate precedent permitted law enforcement's conduct at the time it took place, this case falls within *Davis*'s exception to the exclusionary rule.

In so holding, we reject Gutierrez's contention that alleged official misconduct in this case merits exclusion of the evidence. He raises two arguments. The first is that the officers in this case acted in obvious disregard of established trespass principles. As noted above, however, Supreme Court precedent clearly (if separately) permitted knock-and-talks and drug-dog sniffs, and our precedent clearly permitted lawfully present officers to conduct a dog sniff at the threshold of a living space. It is too simplistic to suggest, as Gutierrez does, that *Jones* and *Jardines* simply reaffirmed the principles of *Olmstead v. United States*, 277 U.S. 438 (1928). *Olmstead* (and its progeny) turned on a straightforward point: "[t]here was no entry" into defendants' homes or offices, so the Fourth Amendment was not implicated. 277 U.S. at 464. *Jardines* was more nuanced: it forbade entering the

curtilage *for the purpose* of doing a dog sniff, but it did not forbid entering the curtilage for the purpose of knocking on the door. Unlike *Jardines*, *Olmstead* never considers purpose. Because the reasoning in these two cases is quite different, Gutierrez's first argument is unpersuasive.

The gravamen of his second argument is that six months after the search of Gutierrez's home, DEA Agent Schmidt submitted an affidavit that was inconsistent in certain respects with his own (and with Detective Sergeant Cline's) contemporaneous reports of the search in this case. For instance, in his affidavit, Schmidt claimed that Gutierrez and Cota had given verbal consent to search the home, but the district court found that Gutierrez was never asked for consent and Cota expressly denied consent. Gutierrez argues that Schmidt's alleged misrepresentation supports exclusion here, as Schmidt exhibited "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Davis*, 131 S. Ct. at 2427 (citation and internal quotation marks omitted). The inconsistencies after the fact give us some pause, but as noted, the officers acted in strict compliance with binding precedent. Furthermore, they secured the premises immediately but did not conduct a search until they had obtained a then-valid search warrant. Finally, the district court wisely held an evidentiary hearing and resolved factual disputes in Gutierrez's favor. This somewhat odd situation, which arose after the fact, does not constitute a deliberate or reckless Fourth Amendment violation.

### III. Conclusion

Because binding appellate precedent permitted law enforcement's conduct at the time it occurred, we AFFIRM the district court's denial of Gutierrez's motion to suppress.