In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3187

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RICHARD GEORGE MARTIN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois
No. 11-CR-10084-001 — **Michael M. Mihm**, *Judge.*

ARGUED SEPTEMBER 9, 2015 — DECIDED NOVEMBER 10, 2015

Before EASTERBROOK, KANNE, and WILLIAMS, *Circuit Judges*.

KANNE, *Circuit Judge.* In August 2010, Normal, Illinois, police attached a battery-powered, global-positioning-system device ("GPS") to the Lincoln sedan belonging to Defendant-Appellant Richard George Martin. Martin was a suspected drug trafficker, and the GPS was being used in an effort to monitor his movements. The police attached the GPS without seeking a warrant or consulting legal counsel

regarding the constitutionality of this investigative technique. Again, without seeking a warrant or legal advice, the police attached a new GPS to the Lincoln on three more occasions, after the device failed or detached. The GPS tracking assisted police in identifying locations Martin used for his drug-trafficking operations, which later led to a search warrant, seizure of evidence, and indictment.

Prior to Martin's trial, the Supreme Court held that the attachment of a GPS to a vehicle and its subsequent use to track a vehicle's movements constitutes a "search" under the Fourth Amendment. *United States v. Jones*, 132 S. Ct. 945, 949 (2012). Relying on *Jones*, Martin moved to suppress the evidence seized as a result of the GPS tracking. The district court denied Martin's motion and found that our binding precedent in 2010 permitted the police's warrantless use of the GPS. Martin was later convicted on one count of drug trafficking and sentenced to a mandatory term of life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A). Martin challenges both the district court's denial of his motion to suppress and his sentence. Finding no error with either decision, we affirm.

## I. BACKGROUND

The Normal police investigation into Martin's drug trafficking began in August 2010. On August 9, 2010, a confidential informant identified Martin as a past supplier of cocaine and marijuana. The next day, the Normal police and an FBI agent coordinated a controlled buy between the confidential informant and Martin in a Target store parking lot. Martin provided the informant about two ounces of cocaine in exchange for $2,200. Martin arrived at the controlled buy in a Lincoln sedan. An earlier "trash rip"—the practice of taking

trash from the curb of a suspected drug-trafficking location to search for evidence—connected Martin to a Broadway Place address known for drug trafficking and two other locations, including a Browne Court address. It was at the Browne Court address that police observed the same Lincoln parked.

On August 19, Normal police used a magnet to attach a battery-powered GPS to Martin's Lincoln, which was parked on a public way near the Broadway Place address. Over the next fifty-five days, Normal police would have to attach a new GPS three times due to detachments or dead batteries. Each time police waited until Martin's Lincoln was on a public way to install the GPS. During this period, police did not consult with in-house counsel or prosecutors regarding the constitutionality of this investigative technique.

An analysis of the GPS data by an FBI agent assisting the investigation revealed that while the Lincoln primarily remained at the Broadway Place address, it made twenty-eight trips to the Browne Court location during the observation period for an average of thirty minutes. The GPS analysis also indicated Martin's Lincoln had traveled to a storage unit on Olympia Drive. Up to that point, no other evidence had linked the Olympia Drive location to Martin. Police subsequently went to the storage unit with a certified narcotics detection dog who, after sniffing outside the storage unit, indicated a presence of illegal drugs.[1]

---

[1] Martin does not challenge on appeal the use of a drug-sniffing dog outside his storage unit, even though he challenged its use there and at the Browne Court location before the district court. In his motion to sup-

(continued…)

The GPS was detached from the Lincoln for good on October 12, the same day police executed search warrants for the Broadway, Browne, and Olympia locations. All told, the GPS sent data tracking Martin's Lincoln for just over forty-five days. Despite the GPS's extensive use in the investigation, there is no reference to the multiple GPS installations in the affidavit made in support of the search warrants, nor is there any discussion of the same in any contemporaneous police reports in the record. There is, however, extensive discussion in the search warrant affidavit of multiple trash rips, open-air dog sniffs, surveillance, the controlled buy, and other investigative steps.

Normal police, an FBI agent, and a McLean County Sheriff's deputy performed the searches, which yielded 83.8 grams of cocaine, 894 grams of marijuana, plastic bags used for drug packaging, a scale, a vacuum sealer, and $73,313.57, more than $50,331.57 of which came from the Olympia Drive location. Martin was arrested the same day.

In September 2011, a federal grand jury returned a one-count indictment against Martin and three other co-defendants for conspiracy with intent to distribute more than five kilograms of cocaine and fifty kilograms of mariju-

---

(…continued)

press, he relied on *Florida v. Jardines*, 133 S. Ct. 1409 (2013), which held that the use of drug-sniffing dogs on a home's curtilage constituted a "search" within the meaning of the Fourth Amendment. The district court denied the motion, finding Martin lacked standing to challenge the Browne Court "search" because he did not have a subjective expectation of privacy there and that the open air sniff at the Olympia Drive location was not a "search" because it did not occur on the storage unit's curtilage.

ana. *See* 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), 841(b)(1)(B). Almost two years later, a superseding indictment was returned on the same count but expanding the time period of the conspiracy by two years.

In January 2012, the Supreme Court decided *Jones*, which held that installation of GPS on a vehicle and subsequent GPS tracking constituted a Fourth Amendment "search." 132 S. Ct. at 949. Relying on *Jones*, Martin filed a motion to suppress evidence "RE GPS" in May 2013, seeking to exclude any evidence seized as a result of GPS tracking from his trial. He argued that the fifty-five days of GPS tracking without a warrant was an "illegal search and seizure" that violated "his legitimate expectation of privacy."[2] (Def.'s Mot. to Suppress Evidence Re GPS at 2.) At the September 23, 2013 evidentiary hearing, Martin established that the Normal police officers responsible for installing the GPS had not obtained a warrant prior to the GPS installations and subsequent tracking or sought legal advice regarding whether these activities constituted a "search" under the Fourth Amendment. It was also established that the officers had not referenced the GPS installations or removal in their reports and were unaware of any department policies, procedures, or regulations relating to GPS tracking.

The district court denied Martin's motion to suppress. While the district court recognized that *Jones* made GPS installation and subsequent tracking a "search" under the

---

[2] Martin incorrectly stated in his motion that the GPS tracking had lasted fifty-five days when in fact it had only been tracking Martin's Lincoln for just over forty-five days.

Fourth Amendment, it concluded that *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007), was the controlling law at the time and authorized the officers' investigative tactics. Despite ruling for the Government, the district court observed the following about the Normal police officers' failure to detail their GPS installations in their reports:

> I will tell you, I am not happy—perhaps it's clear from my questions. I'm very unhappy about the fact that neither one of these officers made any mention in any report of when they installed these devices or changed them. This is the type of thing even without a change in the law that could easily be expected to lead to disputes or contentions in court; so, the idea that, well, there wasn't any perceived need to include this in the report, I'm very troubled by that. And perhaps it even has a little bit of effect on my assessment of their credibility.

(Supp. Tr. 105:21-106:7.)

In December 2013, a jury convicted Martin of conspiracy to distribute and possession with intent to distribute more than five kilograms of cocaine and fifty kilograms of marijuana. Prior to trial and pursuant to 21 U.S.C. § 851, the Government filed a notice of intent to seek enhanced penalties under 21 U.S.C. § 841(b) in which it listed four of Martin's previous felony drug convictions. After trial but before sentencing, Martin opposed the Government's notice on the grounds that the mandatory life prison term required by § 841(b) violated the Eighth Amendment's prohibition against cruel and unusual punishment and that § 851(e)'s time limitation violated due process. On September 23, 2014, the district court denied Martin's objections and sentenced him to a mandatory term of life in prison without parole.

## II. ANALYSIS

Martin attacks both the district court's denial of his motion to suppress and his sentence. He contends that the evidence seized as a result of the warrantless GPS tracking should be suppressed as fruits of an illegal "search" and that the exclusionary rule should apply because police acted with reckless disregard of the Fourth Amendment by failing to determine the legality of their then-legal "search." Agreeing that the life sentence imposed by the district court was required by statute, Martin only argues the mandatory life sentence required by § 841(b) is unconstitutional.

*A. Martin's Motion To Suppress*

We review the denial of a motion to suppress under a dual standard of review with factual findings reviewed for clear error and legal conclusions reviewed *de novo*. *United States v. Kelly*, 772 F.3d 1072, 1077 (7th Cir. 2014); *United States v. Freeman*, 691 F.3d 893, 899 (7th Cir. 2012).

The Fourth Amendment provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It, however, "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *United States v. Leon*, 468 U.S. 897, 906 (1984). The illegal search and its fruits "work no new Fourth Amendment wrong," as the constitutional harm is the unlawful search itself. *United States v. Calandra*, 414 U.S. 338, 354 (1974). To "compel respect for the constitutional guaranty" then, the Supreme Court fashioned the exclusionary rule. *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (citation and quotation marks omitted). The rule is not a "personal

constitutional right,"*Calandra*, 414 U.S. at 348, and its appli-
cation "exacts a heavy toll on both the judicial system and
society at large," as its effect often "is to suppress the truth
and set the criminal loose in the community without pun-
ishment." *Davis*, 131 S.Ct. at 2427. Because its use must out-
weigh its heavy social costs, *Herring v. United States*, 555 U.S.
135, 141 (2009), the exclusionary rule has been limited to
serve the purpose of deterring official misconduct and is
generally only applied "[w]hen the police exhibit deliberate,
reckless, or grossly negligent disregard for Fourth Amend-
ment rights," *Davis*, 131 S. Ct. at 2427 (citation and quotation
marks omitted).

Because of these competing interests, several situations
exist in which the exclusionary rule does not apply, includ-
ing "when the police conduct a search in objectively reason-
able reliance on binding judicial precedent." *Davis*, 131 S. Ct.
at 2428. Referred to as the "good-faith exception" in *Davis*,
*id.* at 2429, we have applied this principle in refusing to sup-
press evidence seized as a result of warrantless GPS installa-
tion and tracking, *United States v. Brown*, 744 F.3d 474, 477–
78 (7th Cir. 2014), and believe it applies here. In *Brown*, we
concluded that "binding appellate precedent" would have
authorized officers in 2006 to install a GPS on a vehicle and
collect its data without a warrant. *Id.* at 478. There, we relied
on two Supreme Court cases, as we had not yet decided
whether GPS installation and subsequent monitoring consti-
tuted a Fourth Amendment "search." *Id.* at 477–78 (citing
*United States v. Knotts*, 460 U.S. 276 (1983) and *United States v.
Karo*, 468 U.S. 705 (1984)). We did, however, recognize that
our decision in *United States v. Garcia*, 474 F.3d 994 (7th Cir.
2007), "established that installation of a GPS device, and the

use of the location data it produces" are not Fourth Amendment "searches." *Brown*, 744 F.3d at 476–77.

Neither party disputes, nor could they, that at the time officers attached the GPS and tracked Martin's Lincoln, their actions were not considered a "search" within the Fourth Amendment and that after *Jones*, they were. Instead, Martin argues the district court misapplied the exclusionary rule by failing to find "good faith" on the officers' part or actual reliance by them on "binding appellate precedent." According to Martin, the officers should have attempted to determine if their conduct was lawful in order to avoid application of the exclusionary rule; otherwise, their actions amount to bad faith and demonstrate the type of reckless disregard that justifies the use of the exclusionary rule and its deterrent effect. For support, he directs us to the officers' failure to determine whether their conduct comported with then-existing Fourth Amendment precedent—either by researching the law themselves or by consulting with legal counsel or superiors.[3] Martin also points to the absence of Normal police department policies, procedures, or regulations regarding the lawfulness of GPS installation and tracking as further evidence of recklessness. That binding appellant precedent approved the officers' warrantless GPS installation and subsequent monitoring here is of no moment, Martin argues, because the Government should not "benefit[] from a fortuitous coincidence." (Appellant's Reply Br. at 1.)

---

[3] Despite Martin's contentions, it is unclear from the hearing testimony if the officers consulted with a superior regarding their decision to install a GPS. (Supp. Tr. 93:6–25.) Because our decision does not turn on this fact, we need not resolve the uncertainty.

We disagree. The Government does get the benefit of a "fortuitous coincidence" on these facts. The standard set forth in *Davis* is an objective one that does not invite "'federal courts on an expedition into the minds of police officers[,]'" a foray that "'would produce a grave and fruitless misallocation of judicial resources.'" *Leon*, 468 U.S. at 922 n. 23 (quoting *Massachussetts v. Painten*, 389 U.S. 560, 565 (1968) (White, J., dissenting)); *see also Illinois v. Krull*, 480 U.S. 340, 355 (1987) ("As we emphasized in *Leon*, the standard of reasonableness we adopt is an objective one; the standard does not turn on the subjective good faith of individual officers."). Rather, it asks if the searches were "conducted in *objectively* reasonable reliance on binding appellate precedent." *Davis*, 131 S. Ct. at 2423–24 (emphasis added). In other words, this standard seeks to answer the "objectively ascertainable question" of "whether a reasonably well trained officer would have known that the search was illegal in light" of binding appellate precedent. *Herring*, 555 U.S. at 145 (quotation marks and citation omitted). Here, "a reasonably well trained officer" in 2010 would have known that *Garcia* permitted him or her to attach a GPS device to Martin's Lincoln and monitor it without having to seek a warrant. The "subjective awareness" of the officers here is irrelevant. *See id*. Also irrelevant is whether the officers had any training on *Garcia*'s holding or if they consulted legal counsel or prosecutors regarding the legality of their GPS installation and subsequent tracking.

That is not to say that the actions or inactions of the police will never factor into the exclusionary rule analysis. The Court has made clear that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such

deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. The words "deliberate" and "culpable" imply that under some circumstances, we must undertake an objective measure of the police's conduct. *See id.* at 143–44 (collecting cases where an analysis of police's conduct lead to an application of the exclusionary rule).

Indeed, under our facts, had the law regarding GPS installation and tracking not been settled, there would have been a question as to whether the police's conduct here was "deliberate, reckless, or grossly negligent" enough to warrant application of the exclusionary rule. *Davis*, 131 S. Ct. at 2427–28. Police here provided detailed summaries in contemporaneous reports and the search warrant affidavit of their investigative activities, including trash rips, controlled buys, and surveillance.

But in this otherwise detailed reporting, the police omitted any reference to the four separate GPS installations. These omissions troubled the district court and beg the question of whether the "reasonably trained officer" would omit such investigative activities from his or her reports and affidavit. Omitting such key facts may under certain circumstances justify the use of the exclusionary rule. *See United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014) (stating that "[a]n officer's omission from the probable cause affidavit of known and substantial adverse information about the informant's credibility is sufficient to support a reasonable inference of recklessness" and reversing district court's denial of a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978)).

This situation is not one of them. Rather, our situation is akin to a legal impossibility, *i.e.* even if the police here had exhibited sufficient recklessness through their actions, we

would still refrain from applying the exclusionary rule because warrantless GPS installation and subsequent tracking were authorized by our precedent.

Martin attempts to support his position that there must be affirmative evidence of "good faith" or actual reliance by directing us to the cases where we have applied *Davis*'s holding. According to Martin, there was evidence in these cases that the police had acted without recklessness or gross negligence. He notes that in *Brown*, police believed their installation of a GPS tracking device on a vehicle with the owner's consent was the same as asking an informant to wear a concealed recording device, 744 F.3d at 476, and that in *United States v. Gutierrez*, 760 F.3d 750 (7th Cir. 2014), a prosecutor instructed the police to conduct the warrantless search at issue, *id.* at 752. As for *United States v. Taylor*, 776 F.3d 513 (7th Cir. 2014), he highlights that a deputy prosecutor sought authority from the court to attach a GPS device before the warrantless search occurred. *Id.* at 514. From these cases, he concludes that we have only refused to apply the exclusionary rule where police "*did not* act recklessly, deliberately, or with gross negligence because they acted in good faith reliance on the belief that the law permitted their conduct." (Appellant's Br. at 18 (emphasis original).)

Martin misinterprets the holdings of these cases. Our analysis and holding in these cases turned on whether binding appellate precedent authorized the police's conduct in each situation, not the facts Martin calls to our attention. *See Taylor*, 776 F.3d at 517–19; *Gutierrez*, 760 F.3d at 754–57; *Brown*, 744 F.3d at 476–78. So too did our decision in *United States v. Gary*, 790 F.3d 704 (7th Cir. 2015), where we rejected an argument similar to the one Martin advances. There, the

defendant argued there was no evidence that police relied on binding appellate precedent when they searched defendant's phone after an arrest without a warrant. *Id.* at 711. This search occurred five years before the Supreme Court issued its decision in *Riley v. California*, 134 S. Ct. 2473 (2014), which held a warrantless search of a cell phone is an impermissible search incident to arrest. *Id.* at 705. Finding no evidence of culpable conduct on the police's part and that our precedent permitted the police's activities, we held "[o]bjectively, the officer's search of the cell phone was lawful under then-binding precedent," and therefore, the district court properly denied the motion to suppress. *Id.* at 711.

Also fatal to Martin's position is that the facts of *Davis* itself do not support his strained interpretation. In *Davis*, the police performed a warrantless vehicle search, after arresting the driver for operating while intoxicated and the passenger for providing a false name. 131 S. Ct. at 2425. At the time of the search, the Supreme Court had not yet decided *Arizona v. Gant*, 556 U.S. 332 (2009), which no longer permitted the type of search that occurred in *Davis*. *Id.* at 2426. When it occurred, however, that search was authorized by binding appellate precedent. *Id.* at 2426. There is no suggestion in *Davis* that the police *actually* relied upon that binding appellate precedent prior to searching the vehicle. There are also no facts suggesting police consulted with legal counsel or prosecutors regarding the legality of their search or received training on the same topic. If we were to accept Martin's invitation here then, we would be grafting on a requirement to *Davis*'s holding for the Government to demonstrate *actual* reliance or "good faith." We decline Martin's invitation and find that the district court did not err by denying the motion to suppress.

*B. Martin's Constitutional Challenge To His Sentence*

Martin argues his mandatory life sentence under § 841(b) violates his Eighth Amendment protection against cruel and unusual punishment. While we review constitutional challenges to sentences *de novo*, *United States v. Figueroa–Espana*, 511 F.3d 696, 705 (7th Cir. 2007), we do not need to reach the issue here. Martin acknowledges that we have held that *Harmelin v. Michigan*, 501 U.S. 957 (1991), controls such questions and forecloses any challenge to Martin's mandatory minimum sentence under § 841(b). *See, e.g.*, *United States v. Ousley*, 698 F.3d 972, 974–76 (7th Cir. 2012). That is why Martin concedes that he only challenges his sentence to preserve it for a possible appeal to the Supreme Court. As such, we decline to revisit our previous holdings today and overrule the Supreme Court. *See Grayson v. Schuler*, 666 F.3d 450, 453 (7th Cir. 2012) ("[W]e're not supposed to declare a decision by the Supreme Court overruled unless the Court makes clear that the case has been overruled, even if we're confident that the Court would overrule it if the occasion presented itself.") (citation omitted). Therefore, we find the district court did not err in sentencing Martin to a mandatory life sentence under § 841(b).

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.