In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1871

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT L. BERRIOS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 853-1 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 30, 2020 — DECIDED MARCH 5, 2021

Before SYKES, *Chief Judge*, and WOOD and BRENNAN, *Circuit
Judges*.

WOOD, *Circuit Judge*. During much of the year 2012, Robert
Berrios and his associates engaged in a spree of armed rob-
beries in Chicago, targeting cellphone stores, currency ex-
changes, dollar stores, and retail pharmacies. Berrios was
eventually caught and convicted on numerous Hobbs Act
counts. See 18 U.S.C. § 1951(a). He raises one issue on appeal:
whether the district court erred when it denied his motion to

suppress evidence that the government found through a warrantless search of his cellphone. If the evidence collected during the search was to be admitted, he contends, it was only through the application of the good-faith exception recognized in *Davis v. United States*, 564 U.S. 229, 241 (2011), and he argues that his case does not fit within *Davis*. We all agree that this was a close call. In the end, however, we conclude that although there was no binding precedent that would have exempted this search from the exclusionary rule, the independent-source rule allowed the admission of the limited evidence the government used. We therefore affirm Berrios's conviction.

**I**

Berrios's prosecution began with the issuance of a criminal complaint on November 5, 2012, in the Northern District of Illinois, charging him with Hobbs Act robbery in connection with an armed robbery of an AT&T Wireless store in Chicago. See 18 U.S.C. § 1951. The next day, as Berrios and his associate, David Revis, were getting ready to rob a currency exchange, the FBI conducted a traffic stop of the white Lexus that Berrios was driving and arrested him without a warrant. During a search incident to that arrest, the agents recovered a Samsung flip phone. They also recovered several other items from the car, including some winter outerwear; a car dealership receipt bearing the name of another associate, Julio Rodriguez, and showing Berrios's phone number; and a black BB gun that the group had used in the robberies.

In connection with the arrest, the FBI conducted a warrantless search of the flip phone they had seized. This included downloading the contacts stored in the phone, call logs, text messages, and photographs. Some of the photos showed

Berrios with his co-defendants. During his post-arrest interviews, Berrios waived his *Miranda* rights. After hearing what the agents had to say, he commented that he was "f***ed." At that point, he asked to speak with a lawyer.

The grand jury returned a superseding indictment on October 15, 2013, charging Berrios, Revis, Rodriguez, and Luis Diaz with various Hobbs Act offenses, as well as some firearms offenses. The case moved slowly, but after going through a couple of lawyers, in early 2016 Berrios filed a motion to suppress the evidence that the FBI had obtained through the warrantless search of his phone. The government admitted that the search was illegal under *Riley v. California*, 573 U.S. 373 (2014), and that *Riley* applied retroactively. Nonetheless, it argued, the law at the time of the search did not prohibit it, and thus the good-faith exception to the exclusionary rule recognized in *Davis v. United States*, 564 U.S. 229, 241 (2011), applied.

The district court accepted the government's position and denied Berrios's motion. Berrios proceeded to jury trial on nine counts of Hobbs Act robbery in December 2017, acting *pro se* with standby counsel. The details of those robberies need not detain us, because at this point the only thing that matters is the court's handling of Berrios's suppression motion. Before turning to that point, however, it is important to note that the evidence from the phone did not stand alone. Far from it: the government presented evidence from a number of sources, including:

- Rodriguez's testimony;

- Berrios's post-arrest statements;

- A recorded call that Berrios made from jail to his girlfriend, in which he admitted that he committed at least one robbery;

- Surveillance videos from the victim stores;

- Testimony from robbery victims;

- Testimony from Jose Hernandez, an employee of one of the victim stores;

- Testimony from Sabrina Couvee, who was Rodriguez's girlfriend at the time;

- A car dealership receipt showing the purchase of the white Lexus, with Berrios's telephone number on it;

- Agents' testimony about the October 12, 2012, traffic stop of Berrios and Revis; and

- Clothing and guns recovered from the Lexus on the date of Berrios's arrest.

The additional evidence the government culled from Berrios's cellphone included Berrios's own phone number, his contacts list, photographs, text messages, call records between Berrios and his co-conspirators, and cell-site information.

The government used a forensic extraction tool known as Cellbrite to search Berrios's phone. The initial search revealed Berrios's phone number, which he already had given to the police during the October 12, 2012, traffic stop. Berrios confirmed the number during cross-examination at trial. The contacts list showed numbers and nicknames for each co-conspirator, while the call records documented incoming and outgoing calls around the times of the robberies. FBI Special Agent Joseph Raschke introduced historical cell site

information, which placed Berrios's phone in the vicinity of each of the robberies.

As noted earlier, the jury convicted Berrios on all counts. The court sentenced him to a total term of 360 months, which represented 240 months for the conspiracy count and the nine substantive robbery counts, a concurrent sentence of 276 months for possession of a firearm by a convicted felon, and a consecutive sentence of 84 months for brandishing a firearm during one of the robberies.

Berrios filed a notice of appeal. He initially indicated to his appellate counsel that he was not interested in the suppression issue. After reviewing the remainder of the record, counsel concluded that there were no non-frivolous issues that could be raised and filed an *Anders* brief. Berrios changed his tune in his response to that brief, however, and indicated that he did want to challenge the court's decision. We therefore rejected counsel's motion to dismiss the appeal and ordered briefing.

## II

Two sets of legal rules are relevant here: (1) the standard under which we should assess cellphone searches, and (2) the effect that a good-faith but mistaken view of the law has on a suppression motion. We address these issues in turn.

In *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court recognized that modern cellphones are not your grandfather's landline. Indeed, the Court said, modern cellphones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id.* at 385. Responding to the government's argument that a search of all the data on

a cellphone is "materially indistinguishable" from searching a zipper bag or a wallet, the Court said "[t]hat is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together." *Id.* at 393. And, given the data-storage capabilities of even the phones on the market in 2014, when *Riley* was decided, the Court pointed out that these devices are "cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Id.*

All this and more led the Court to hold in *Riley* that the police normally need a warrant to search the contents of a cellphone that has been seized incident to an arrest. *Id.* at 401. The search of Berrios's phone took place almost two years before *Riley* was decided, but the general rule is that it applies in this case, which was pending at the time *Riley* was handed down. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). That does not necessarily win the day for Berrios, however, because there are a few more moving pieces here. Not every violation of the Fourth Amendment's warrant requirement leads to the suppression of evidence. Relying on that fact, the government contends that although the FBI's search of Berrios's phone may have been illegal under *Riley*, any illegality did not require the exclusion of the evidence because the agents were acting in good faith, in reliance on then-binding precedents.

The leading case for this good-faith exception to the exclusionary rule is *Davis v. United States*, 564 U.S. 229 (2011), in which the Supreme Court held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at 241. Key to that decision, however, is the idea of *binding* precedent. As

Justice Sotomayor pointed out in her opinion in *Davis* concurring in the judgment, "[t]his case does not present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Id.* at 249. We acknowledged the distinction between established law and unsettled law in our decisions in *United States v. Martin*, 712 F.3d 1080 (7th Cir. 2013), and *United States v. Jenkins*, 850 F.3d 912 (7th Cir. 2017), where we declined to apply *Davis* to "mistaken efforts to *extend* controlling precedents." 712 F.3d at 1082; 850 F.3d at 920.

The question we must address is whether our circuit's law was established in the government's favor before *Riley*, or if it was unsettled. We begin with *United States v. Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012). The issue there will sound familiar: under what circumstances is the warrantless search of a cellphone permitted by the Fourth Amendment? *Id.* at 804. The facts were straightforward: a drug dealer was setting up a sale of methamphetamine, and he made a call using his cellphone to set up the exchange. Unbeknownst to him, the police intercepted that call and were ready when the deal went down. They arrested the defendant and a co-conspirator, and they seized some cellphones, including the one from which the defendant had placed his call. Still on the scene, and with no warrant, the officers searched that phone, which they had taken directly from the defendant, and obtained its number. Later, using that number, they subpoenaed the telephone company and obtained its call records. Those records confirmed that the seized phone was used for the intercepted call.

The defendant argued that the evidence of the phone number, along with the call-log evidence derived from it, had to be suppressed, but both the district court and this court

ruled against him. The government's theory was that any cell-phone is nothing more than a container, just like a diary or a briefcase, and its number is functionally nothing more than an item inside that container. Recognizing the vast body of data that a cellphone normally contains, we hesitated to embrace that analogy without qualification. Instead, we stayed close to the facts, which showed nothing more than a minimal intrusion on the defendant's privacy—no more than would have occurred if the defendant had been carrying an old-fashioned diary and the police had simply opened it to its first page. In that type of situation, where the intrusion is no worse than it would have been in the pre-Internet age, we saw no reason to require suppression where it would not have been required before.

Our closing remarks reflect the careful path we were following. We cautioned that "[w]e need not consider what level of risk to personal safety or to the preservation of evidence would be necessary to justify a more extensive search of a cell phone without a warrant … ." *Id.* at 810. Our holding, we stressed, was limited: "the police did not search the contents of the defendant's cell phone, but were content to obtain the cell phone's phone number." *Id.* Thus, the only point clearly established by *Flores-Lopez* was that a search limited to those items was constitutional. It was not a binding precedent that purported to authorize a search as comprehensive as the one the agents conducted on Berrios's phone.

Next in line is *United States v. Gary*, 790 F.3d 704 (7th Cir. 2015), on which the district court expressly relied. Like *Flores-Lopez*, *Gary* was a case involving a search incident to an arrest. Gary was detained in 2009 by the police after a traffic stop (whose validity the court upheld). The police seized his

cellphone and, back at the station, searched it to obtain the number and a log of calls it had received. Relying on *Riley*, which had been decided by the time Gary's case reached this court, Gary argued that the fruits of the search had to be suppressed. We found otherwise. We noted that *United States v. Robinson*, 414 U.S. 218 (1973), authorized searches of personal effects when such a search is incident to a valid arrest, and that the qualification *Riley* added to that rule was five years in the future at the time Gary was arrested. We also observed that as of 2009, we had never differentiated between searches of physical items and searches of digital data. 790 F.3d at 710. The search of Gary's phone, we concluded, was materially indistinguishable from the ones in *United States v. Ortiz*, 84 F.3d 977 (7th Cir. 1996), and *Flores-Lopez*, and so the officers were entitled to rely on *Davis*'s good-faith rule.

Neither *Flores-Lopez* nor *Gary* authorized a wholesale search of a cellphone, beyond the limits that were present in those two cases. In keeping with our approach in a number of earlier decisions, which have followed the caveat in Justice Sotomayor's opinion in *Davis*, we decline again to apply *Davis* "to excuse mistaken efforts to *extend* controlling precedents." *Jenkins*, 850 F.3d at 920. We thus conclude that the good-faith exception recognized by *Davis* does not overcome the exclusionary rule on these facts.

Recognizing this possibility, the government argues that even if *Davis* does not rescue this evidence, any error was harmless. It acknowledges that Berrios preserved his objection to the admission of the evidence in the district court, and so he does not face the enhanced burden of showing plain error. But Federal Rule of Criminal Procedure 52(a) directs us to consider the possibility of harmless error. See *United States v.*

*Rivera*, 817 F.3d 339, 343–44 (7th Cir. 2016) (harmless-error rule applies to searches and arrests); *United States v. Nance*, 236 F.3d 820, 825–26 (7th Cir. 2000) (list of errors that *Neder v. United States*, 527 U.S. 1, 8 (1999), indicates are not subject to harmless-error analysis does not include failure to suppress evidence).

Whatever else the government found in Berrios's phone, the fact remains that the only evidence that was admitted at trial was his telephone number and the names and numbers of his co-conspirators included in his saved contacts list. The flip phone that Berrios was carrying contained much less information than a standard smart phone normally does. Furthermore, virtually all of the evidence the government found on the phone had an independent source and was thus admissible on that ground. See *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). Berrios and his co-conspirator Revis had provided their phone numbers to the police during a traffic stop in October 2012. Berrios confirmed his number during cross-examination at trial, and the number appeared on the car dealership receipt that the agents seized from the car that Berrios was driving at the time of his arrest. And there was other evidence of the identity of the co-conspirators. Notably, Berrios admitted in his testimony to the grand jury—testimony that the petit jury heard—that he was the leader of a robbery crew that included Revis, Diaz, and Delacruz. Berrios testified about 24 armed robberies that he committed, nine of which formed the basis for the charges he faced. And, as we recounted above, there was other independent evidence.

**III**

On this record, therefore, we conclude that had there been no independent source, it would have been error to admit the evidence that the government found, with the help of the Cellbrite technology, on Berrios's flip phone. But the particular items of evidence the government used did have an independent source, and so any mistake in the application of *Riley* and *Davis* was harmless. We therefore AFFIRM the judgment of the district court.